# MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., ET AL. *v.* EPSTEIN ET AL.

No. 94–1809.  Argued November 27, 1995—Decided February 27, 1996

368

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, SOUTER, and BREYER, JJ., joined, and in which STEVENS, J., joined as to Parts I, II–A, and II–C. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 387. GINSBURG, J., filed an opinion concurring in part and dissenting in part, in which STEVENS, J., joined, and in which SOUTER, J., joined as to Part II–B, *post*, p. 388.

*Barry R. Ostrager* argued the cause for petitioners. With him on the briefs was *Geoffrey C. Hazard, Jr.*

*Henry Paul Monaghan* argued the cause for respondents. With him on the brief were *Harold Edgar, Roger W. Kirby,* and *Irving Malchman.**

JUSTICE THOMAS delivered the opinion of the Court.

This case presents the question whether a federal court may withhold full faith and credit from a state-court judgment approving a class-action settlement simply because the settlement releases claims within the exclusive jurisdiction of the federal courts. The answer is no. Absent a partial repeal of the Full Faith and Credit Act, 28 U. S. C. § 1738, by another federal statute, a federal court must give the judgment the same effect that it would have in the courts of the State in which it was rendered.

I

In 1990, petitioner Matsushita Electric Industrial Co. made a tender offer for the common stock of MCA, Inc., a

---

**Daniel J. Popeo* and *Richard A. Samp* filed a brief for the Washington Legal Foundation et al. as *amici curiae* urging reversal.

*Thaddeus Holt* filed a brief for C. L. Grimes as *amicus curiae* urging affirmance.

Delaware corporation. The tender offer not only resulted in Matsushita's acquisition of MCA, but also precipitated two lawsuits on behalf of the holders of MCA's common stock. First, a class action was filed in the Delaware Court of Chancery against MCA and its directors for breach of fiduciary duty in failing to maximize shareholder value. The complaint was later amended to state additional claims against MCA's directors for, *inter alia,* waste of corporate assets by exposing MCA to liability under the federal securities laws. In addition, Matsushita was added as a defendant and was accused of conspiring with MCA's directors to violate Delaware law. The Delaware suit was based purely on state-law claims.

While the state class action was pending, the instant suit was filed in Federal District Court in California. The complaint named Matsushita as a defendant and alleged that Matsushita's tender offer violated Securities and Exchange Commission (SEC) Rules 10b–13 and 14d–10.[1] These Rules were created by the SEC pursuant to the 1968 Williams Act Amendments to the Securities Exchange Act of 1934 (Exchange Act), 48 Stat. 881, as amended, 15 U. S. C. § 78a *et seq.* Section 27 of the Exchange Act confers exclusive jurisdiction upon the federal courts for suits brought to enforce the Act or rules and regulations promulgated thereunder. See 15 U. S. C. § 78aa. The District Court declined to certify the class, entered summary judgment for Matsushita, and dismissed the case. The plaintiffs appealed to the Court of Appeals for the Ninth Circuit.

After the federal plaintiffs filed their notice of appeal but before the Ninth Circuit handed down a decision, the parties

---

[1] We express no opinion in this case on the existence of a private cause of action under §§ 14(d)(6) and (7) of the Securities Exchange Act of 1934, 15 U. S. C. §§ 78n(d)(6) and (7), the statutory authority for Rule 14d–10.

to the Delaware suit negotiated a settlement.[2]  In exchange for a global release of all claims arising out of the Matsushita-MCA acquisition, the defendants would deposit $2 million into a settlement fund to be distributed pro rata to the members of the class.  As required by Delaware Chancery Rule 23, which is modeled on Federal Rule of Civil Procedure 23, the Chancery Court certified the class for purposes of settlement and approved a notice of the proposed settlement.  The notice informed the class members of their right to request exclusion from the settlement class and to appear and present argument at a scheduled hearing to determine the fairness of the settlement.  In particular, the notice stated that "[b]y filing a valid Request for Exclusion, a member of the Settlement Class will not be precluded by the Settlement from individually seeking to pursue the claims alleged in the . . . California Federal Actions, . . . or any other claim relating to the events at issue in the Delaware Actions."  App. to Pet. for Cert. 96a.  Two such notices were mailed to the class members and the notice was also published in the national edition of the Wall Street Journal.  The Chancery Court then held a hearing.  After argument from several objectors, the court found the class representation adequate and the settlement fair.

The order and final judgment of the Chancery Court incorporated the terms of the settlement agreement, providing:

> "All claims, rights and causes of action (state or federal, including but not limited to claims arising under the federal securities law, any rules or regulations promulgated thereunder, or otherwise), whether known or unknown that are, could have been or might in the future be asserted by any of the plaintiffs or any member of the Settlement Class *(other than those who have val-*

---

[2] A previous settlement was rejected by the Court of Chancery as unfair to the class.  See *In re MCA, Inc. Shareholders Litigation,* 598 A. 2d 687 (1991).

*idly requested exclusion therefrom),* . . . in connection with or that arise now or hereafter out of the Merger Agreement, the Tender Offer, the Distribution Agreement, the Capital Contribution Agreement, the employee compensation arrangements, the Tender Agreements, the Initial Proposed Settlement, this Settlement . . . *and including without limitation the claims asserted in the California Federal Actions* . . . are hereby compromised, settled, released and discharged with prejudice by virtue of the proceedings herein and this Order and Final Judgment." *In re MCA, Inc. Shareholders Litigation,* C. A. No. 11740 (Feb. 22, 1993), reprinted in App. to Pet. for Cert. 74a–75a (emphasis added).

The judgment also stated that the notice met all the requirements of due process. The Delaware Supreme Court affirmed. *In re MCA, Inc., Shareholders Litigation,* 633 A. 2d 370 (1993) (judgt. order).

Respondents were members of both the state and federal plaintiff classes. Following issuance of the notice of proposed settlement of the Delaware litigation, respondents neither opted out of the settlement class nor appeared at the hearing to contest the settlement or the representation of the class. On appeal in the Ninth Circuit, petitioner Matsushita invoked the Delaware judgment as a bar to further prosecution of that action under the Full Faith and Credit Act, 28 U. S. C. § 1738.

The Ninth Circuit rejected petitioner's argument, ruling that § 1738 did not apply. *Epstein* v. *MCA, Inc.,* 50 F. 3d 644, 661–666 (1995). Instead, the Court of Appeals fashioned a test under which the preclusive force of a state-court settlement judgment is limited to those claims that "could . . . have been extinguished by the issue preclusive effect of an adjudication of the state claims." *Id.,* at 665. The lower courts have taken varying approaches to determining the preclusive effect of a state-court judgment, entered in a class

or derivative action, that provides for the release of exclusively federal claims.[3]   We granted certiorari to clarify this important area of federal law.   515 U. S. 1187 (1995).

## II

The Full Faith and Credit Act mandates that the "judicial proceedings" of any State "shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken."   28 U. S. C. § 1738.   The Act thus directs all courts to treat a state-court judgment with the same respect that it would receive in the courts of the rendering State.   Federal courts may not "employ their own rules . . . in determining the effect of state judgments," but must "accept the rules chosen by the State from which the judgment is taken."   *Kremer* v. *Chemical Constr. Corp.*, 456 U. S. 461, 481–482 (1982).   Because the Court of Appeals failed to follow the dictates of the Act, we reverse.

## A

The state-court judgment in this case differs in two respects from the judgments that we have previously considered in our cases under the Full Faith and Credit Act.   As respondents and the Court of Appeals stressed, the judgment was the product of a class action and incorporated a settlement agreement releasing claims within the exclusive jurisdiction of the federal courts.   Though respondents urge "the irrelevance of section 1738 to this litigation," Brief for Respondents 25, we do not think that either of these features exempts the judgment from the operation of § 1738.

That the judgment at issue is the result of a class action, rather than a suit brought by an individual, does not under-

---

[3] Compare the decision below with *Grimes* v. *Vitalink Communications Corp.*, 17 F. 3d 1553 (CA3), cert. denied, 513 U. S. 986 (1994); *Nottingham Partners* v. *Trans-Lux Corp.*, 925 F. 2d 29 (CA1 1991); and *Abramson* v. *Pennwood Investment Corp.*, 392 F. 2d 759 (CA2 1968).

mine the initial applicability of § 1738. The judgment of a state court in a class action is plainly the product of a "judicial proceeding" within the meaning of § 1738. Cf. *McDonald* v. *West Branch*, 466 U. S. 284, 287–288 (1984) (holding that § 1738 does not apply to arbitration awards because arbitration is not a "judicial proceeding"). Therefore, a judgment entered in a class action, like any other judgment entered in a state judicial proceeding, is presumptively entitled to full faith and credit under the express terms of the Act.

Further, § 1738 is not irrelevant simply because the judgment in question might work to bar the litigation of exclusively federal claims. Our decision in *Marrese* v. *American Academy of Orthopaedic Surgeons*, 470 U. S. 373 (1985), made clear that where § 1738 is raised as a defense in a subsequent suit, the fact that an allegedly precluded "claim is within the exclusive jurisdiction of the federal courts *does not necessarily make § 1738 inapplicable.*" *Id.*, at 380 (emphasis added). In so holding, we relied primarily on *Kremer* v. *Chemical Constr. Corp.*, *supra*, which held, without deciding whether claims under Title VII of the Civil Rights Act of 1964 are exclusively federal, that state-court proceedings may be issue preclusive in Title VII suits in federal court. *Kremer*, we said, "implies that absent an exception to § 1738, state law determines at least the . . . preclusive effect of a prior state judgment in a subsequent action involving a claim within the exclusive jurisdiction of the federal courts." *Marrese*, 470 U. S., at 381. Accordingly, we decided that "a state court judgment may in some circumstances have preclusive effect in a subsequent action within the exclusive jurisdiction of the federal courts." *Id.*, at 380.

In *Marrese*, we discussed *Nash County Bd. of Ed.* v. *Biltmore Co.*, 640 F. 2d 484 (CA4), cert. denied, 454 U. S. 878 (1981), a case that concerned a state-court settlement judgment. In *Nash*, the question was whether the judgment, which approved the settlement of state antitrust claims, prevented the litigation of exclusively federal antitrust claims.

See 470 U. S., at 382, n. 2. We suggested that the approach outlined in *Marrese* would also apply in cases like *Nash* that involve judgments upon settlement: that is, § 1738 would control at the outset. See 470 U. S., at 382, n. 2. In accord with these precedents, we conclude that § 1738 is generally applicable in cases in which the state-court judgment at issue incorporates a class-action settlement releasing claims solely within the jurisdiction of the federal courts.

## B

*Marrese* provides the analytical framework for deciding whether the Delaware court's judgment precludes this exclusively federal action. When faced with a state-court judgment relating to an exclusively federal claim, a federal court must first look to the law of the rendering State to ascertain the effect of the judgment. See *id.,* at 381–382. If state law indicates that the particular claim or issue would be barred from litigation in a court of that State, then the federal court must next decide whether, "as an exception to § 1738," it "should refuse to give preclusive effect to [the] state court judgment." *Id.,* at 383. See also *Migra* v. *Warren City School Dist. Bd. of Ed.,* 465 U. S. 75, 81 (1984) ("[I]n the absence of federal law modifying the operation of § 1738, the preclusive effect in federal court of [a] state-court judgment is determined by [state] law").

### 1

We observed in *Marrese* that the inquiry into state law would not always yield a direct answer. Usually, "a state court will not have occasion to address the specific question whether a state judgment has issue or claim preclusive effect in a later action that can be brought only in federal court." 470 U. S., at 381–382. Where a judicially approved settlement is under consideration, a federal court may consequently find guidance from general state law on the preclusive force of settlement judgments. See, *e. g., id.,* at

382–383, n. 2 (observing in connection with *Nash* that "[North Carolina] law gives preclusive effect to consent judgment[s]"). Here, in addition to providing rules regarding the preclusive force of class-action settlement judgments in subsequent suits in state court, the Delaware courts have also spoken to the particular effect of such judgments in federal court.

Delaware has traditionally treated the impact of settlement judgments on subsequent litigation in state court as a question of claim preclusion. Early cases suggested that Delaware courts would not afford claim preclusive effect to a settlement releasing claims that could not have been presented in the trial court. See *Ezzes* v. *Ackerman*, 234 A. 2d 444, 445–446 (Del. 1967) ("[A] judgment entered either after trial on the merits or upon an approved settlement is *res judicata* and bars subsequent suit on the same claim . . . . [T]he defense of *res judicata* . . . is available if the pleadings framing the issues in the first action would have permitted the raising of the issue sought to be raised in the second action, and if the facts were known, or could have been known to the plaintiff in the second action at the time of the first action"). As the Court of Chancery has perceived, however, "the *Ezzes* inquiry [was] modified in regard to class actions," *In re Union Square Associates Securities Litigation*, C. A. No. 11028, 1993 WL 220528, *3 (June 16, 1993), by the Delaware Supreme Court's decision in *Nottingham Partners* v. *Dana*, 564 A. 2d 1089 (1989).

In *Nottingham*, a class action, the Delaware Supreme Court approved a settlement that released claims then pending in federal court. In approving that settlement, the *Nottingham* court appears to have eliminated the *Ezzes* requirement that the claims could have been raised in the suit that produced the settlement, at least with respect to class actions:

"'[I]n order to achieve a comprehensive settlement that would prevent relitigation of settled questions at the

core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action.'" 564 A. 2d, at 1106 (quoting *TBK Partners, Ltd.* v. *Western Union Corp.*, 675 F. 2d 456, 460 (CA2 1982)).

See *Union Square, supra,* at *3 (relying directly on *Nottingham* to hold that a Delaware court judgment settling a class action was res judicata and barred arbitration of duplicative claims that could not have been brought in the first suit). These cases indicate that even if, as here, a claim could not have been raised in the court that rendered the settlement judgment in a class action, a Delaware court would still find that the judgment bars subsequent pursuit of the claim.

The Delaware Supreme Court has further manifested its understanding that when the Court of Chancery approves a global release of claims, its settlement judgment should preclude ongoing or future federal-court litigation of any released claims. In *Nottingham,* the Court stated that "[t]he validity of executing a general release in conjunction with the termination of litigation has long been recognized by the Delaware courts. More specifically, the Court of Chancery has a history of approving settlements that have implicitly or explicitly included a general release, which would also release federal claims." 564 A. 2d, at 1105 (citation omitted). Though the Delaware Supreme Court correctly recognized in *Nottingham* that it lacked actual authority to order the dismissal of any case pending in federal court, it asserted that state-court approval of the settlement would have the collateral effect of preventing class members from prosecuting their claims in federal court. Perhaps the clearest statement of the Delaware Chancery Court's view on this matter was articulated in the suit preceding this one: "When a state court settlement of a class action releases all claims which arise out of the challenged transaction and is determined to

be fair and to have met all due process requirements, the class members are bound by the release or the doctrine of issue preclusion. Class members cannot subsequently relitigate the claims barred by the settlement in a federal court." *In re MCA, Inc. Shareholders Litigation*, 598 A. 2d 687, 691 (1991).[4] We are aware of no Delaware case that suggests otherwise.

Given these statements of Delaware law, we think that a Delaware court would afford preclusive effect to the settlement judgment in this case, notwithstanding the fact that respondents could not have pressed their Exchange Act claims in the Court of Chancery. The claims are clearly within the scope of the release in the judgment, since the judgment specifically refers to this lawsuit. As required by Delaware Court of Chancery Rule 23, see *Prezant* v. *De Angelis*, 636 A. 2d 915, 920 (1994), the Court of Chancery found, and the Delaware Supreme Court affirmed, that the settlement was "fair, reasonable and adequate and in the best interests of the . . . Settlement class" and that notice to the class was "in full compliance with . . . the requirements of due process." *In re MCA, Inc. Shareholders Litigation*, C. A. No. 11740 (Feb. 22, 1993), reprinted in App. to Pet. for Cert. 73a, 74a. Cf. *Phillips Petroleum Co.* v. *Shutts*, 472 U. S. 797, 812 (1985) (due process for class-action plaintiffs requires "notice plus an opportunity to be heard and participate in the litigation"). The Court of Chancery "further determined that the plaintiffs[,] . . . as representatives of the Settlement Class, have fairly and adequately protected the

---

[4] In fact, the Chancery Court rejected the first settlement, which contained no opt-out provision, as unfair to the class precisely because it believed that the settlement would preclude the class from pursuing their exclusively federal claims in federal court. See *In re MCA, Inc. Shareholders Litigation*, 598 A. 2d, at 692 ("[I]f this Court provides for the release of all the claims arising out of the challenged transaction, the claims which the Objectors have asserted in the federal suit will likely be forever barred").

interests of the Settlement Class." *In re MCA, Inc. Shareholders Litigation, supra,* reprinted in App. to Pet. for Cert. 73a. Cf. *Phillips Petroleum Co., supra,* at 812 (due process requires that "the named plaintiff at all times adequately represent the interests of the absent class members").[5] Under Delaware Rule 23, as under Federal Rule of Civil Procedure 23, "[a]ll members of the class, whether of a plaintiff or a defendant class, are bound by the judgment entered in the action unless, in a Rule 23(b)(3) action, they make a timely election for exclusion." 2 H. Newberg, Class Actions § 2755, p. 1224 (1977). See also *Cooper* v. *Federal Reserve Bank of Richmond,* 467 U. S. 867, 874 (1984) ("There is of course no dispute that under elementary principles of prior adjudication a judgment in a properly entertained class action is binding on class members in any subsequent litigation"). Respondents do not deny that, as shareholders of MCA's common stock, they were part of the plaintiff class and that they never opted out; they are bound, then, by the judgment.[6]

---

[5] Apart from any discussion of Delaware law, respondents contend that the settlement proceedings did not satisfy due process because the class was inadequately represented. See Brief for Respondents 34–45. Respondents make this claim in spite of the Chancery Court's express ruling, following argument on the issue, that the class representatives fairly and adequately protected the interests of the class. Cf. *Prezant* v. *De Angelis,* 636 A. 2d 915, 923 (Del. 1994) ("[The] constitutional requirement [of adequacy of representation] is embodied in [Delaware] Rule 23(a)(4), which requires that the named plaintiff 'fairly and adequately protect the interests of the class'"). We need not address the due process claim, however, because it is outside the scope of the question presented in this Court. See *Yee* v. *Escondido,* 503 U. S. 519, 533 (1992). While it is true that a respondent may defend a judgment on alternative grounds, we generally do not address arguments that were not the basis for the decision below. See *Peralta* v. *Heights Medical Center, Inc.,* 485 U. S. 80, 86 (1988).

[6] Respondents argue that their failure to opt out of the settlement class does not constitute consent to the terms of the settlement under traditional contract principles. Brief for Respondents 16–25. Again, the issue raised by respondents—whether the settlement could bar this suit

2

Because it appears that the settlement judgment would be res judicata under Delaware law, we proceed to the second step of the *Marrese* analysis and ask whether § 27 of the Exchange Act, which confers exclusive jurisdiction upon the federal courts for suits arising under the Act, partially repealed § 1738. Section 27 contains no express language regarding its relationship with § 1738 or the preclusive effect of related state-court proceedings. Thus, any modification of § 1738 by § 27 must be implied. In deciding whether § 27 impliedly created an exception to § 1738, the "general question is whether the concerns underlying a particular grant of exclusive jurisdiction justify a finding of an implied partial repeal of § 1738." *Marrese*, 470 U. S., at 386. "Resolution of this question will depend on the particular federal statute as well as the nature of the claim or issue involved in the subsequent federal action. . . . [T]he primary consideration must be the intent of Congress." *Ibid.*

As a historical matter, we have seldom, if ever, held that a federal statute impliedly repealed § 1738. See *Parsons Steel, Inc. v. First Alabama Bank*, 474 U. S. 518, 523–525 (1986) (Anti-Injunction Act does not limit § 1738); *Migra v. Warren City School Dist. Bd. of Ed.*, 465 U. S., at 83–85 (42 U. S. C. § 1983 does not limit claim preclusion under § 1738); *Kremer v. Chemical Constr. Corp.*, 456 U. S., at 468–476 (Title VII of the Civil Rights Act of 1964 does not limit § 1738); *Allen v. McCurry*, 449 U. S. 90, 96–105 (1980) (§ 1983 does not limit issue preclusion under § 1738). But cf. *Brown v. Felsen*, 442 U. S. 127, 138–139 (1979) (declining to give claim preclusive

---

as a matter of contract law, as distinguished from § 1738 law—is outside the scope of the question on which we granted certiorari. We note, however, that if a State chooses to approach the preclusive effect of a judgment embodying the terms of a settlement agreement as a question of pure contract law, a federal court must adhere to that approach under § 1738. *Kremer v. Chemical Constr. Corp.*, 456 U. S. 461, 481–482 (1982).

effect to prior state-court debt collection proceeding in federal bankruptcy suit, without discussing § 1738, state law, or implied repeals). The rarity with which we have discovered implied repeals is due to the relatively stringent standard for such findings, namely, that there be an "'irreconcilable conflict'" between the two federal statutes at issue. *Kremer* v. *Chemical Constr. Corp., supra,* at 468 (quoting *Radzanower* v. *Touche Ross & Co.,* 426 U. S. 148, 154 (1976)).

Section 27 provides that "[t]he district courts of the United States . . . shall have exclusive jurisdiction . . . of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder." 15 U. S. C. § 78aa. There is no suggestion in § 27 that Congress meant for plaintiffs with Exchange Act claims to have more than one day in court to challenge the legality of a securities transaction. Though the statute plainly mandates that suits alleging violations of the Exchange Act may be maintained only in federal court, nothing in the language of § 27 "remotely expresses any congressional intent to contravene the common-law rules of preclusion or to repeal the express statutory requirements of . . . 28 U. S. C. § 1738." *Allen* v. *McCurry, supra,* at 97–98.

Nor does § 27 evince any intent to prevent litigants in state court—whether suing as individuals or as part of a class— from voluntarily releasing Exchange Act claims in judicially approved settlements. While § 27 prohibits state courts from adjudicating claims arising under the Exchange Act, it does not prohibit state courts from approving the release of Exchange Act claims in the settlement of suits over which they have properly exercised jurisdiction, *i. e.,* suits arising under state law or under federal law for which there is concurrent jurisdiction. In this case, for example, the Delaware action was not "brought to enforce" any rights or obligations under the Act. The Delaware court asserted judicial power

over a complaint asserting purely state-law causes of action[7] and, after the parties agreed to settle, certified the class and approved the settlement pursuant to the requirements of Delaware Rule of Chancery 23 and the Due Process Clause. Thus, the Delaware court never trespassed upon the exclusive territory of the federal courts, but merely approved the settlement of a common-law suit pursuant to state and nonexclusive federal law. See *Abramson* v. *Pennwood Investment Corp.*, 392 F. 2d 759, 762 (CA2 1968) ("Although the state court could not adjudicate the federal claim, it was within‛ its powers over the corporation and the parties to approve the release of that claim as a condition of settlement of the state action"). While it is true that the state court assessed the general worth of the federal claims in determining the fairness of the settlement, such assessment does not amount to a judgment on the merits of the claims. See *TBK Partners, Ltd.* v. *Western Union Corp.*, 675 F. 2d 456, 461 (CA2 1982) (" 'Approval of a settlement does not call for findings of fact regarding the claims to be compromised. The court is concerned only with the *likelihood* of success or failure; the actual merits of the controversy are not to be determined' ") (quoting Haudek, The Settlement and Dismissal of Stockholders' Actions-Part II: The Settlement, 23 Sw. L. J. 765, 809 (1969) (footnotes omitted)). The Delaware court never purported to resolve the merits of the Exchange Act claims in the course of appraising the settlement; indeed, it expressly disavowed that purpose. See *In re MCA, Inc. Shareholders Litigation*, C. A. No. 11740 (Feb. 16, 1993), reprinted in App. to Pet. for Cert. 68a ("In determining whether a settlement should be approved, a court should not try the merits of the underlying claims. This principle would seem to be especially appropriate where the under-

---

[7] Though the plaintiff class premised one of its claims of fiduciary breach on the allegation that MCA wasted corporate assets by exposing the corporation to liability under the federal securities laws, the cause pleaded was nonetheless a state *common-law* action for breach of fiduciary duty.

lying claims, like the federal claims here, are outside the jurisdiction of this Court" (citation omitted)).

The legislative history of the Exchange Act elucidates no specific purpose on the part of Congress in enacting § 27. See *Murphy* v. *Gallagher*, 761 F. 2d 878, 885 (CA2 1985) (noting that the legislative history of the Exchange Act provides no readily apparent explanation for the provision of exclusive jurisdiction in § 27) (citing 2 & 3 L. Loss, Securities Regulation 997, 2005 (2d ed. 1961)). We may presume, however, that Congress intended § 27 to serve at least the general purposes underlying most grants of exclusive jurisdiction: "to achieve greater uniformity of construction and more effective and expert application of that law." *Murphy* v. *Gallagher, supra,* at 885. When a state court upholds a settlement that releases claims under the Exchange Act, it threatens neither of these policies. There is no danger that state-court judges who are not fully expert in federal securities law will say definitively what the Exchange Act means and enforce legal liabilities and duties thereunder. And the uniform construction of the Act is unaffected by a state court's approval of a proposed settlement because the state court does not adjudicate the Exchange Act claims but only evaluates the overall fairness of the settlement, generally by applying its own business judgment to the facts of the case. See, *e. g., Polk* v. *Good,* 507 A. 2d 531, 535 (Del. 1986).

Furthermore, other provisions of the Exchange Act suggest that Congress did not intend to create an exception to § 1738 for suits alleging violations of the Act. Congress plainly contemplated the possibility of dual litigation in state and federal courts relating to securities transactions. See 15 U. S. C. § 78bb(a) (preserving "all other rights and remedies that may exist at law or in equity"). And all that Congress chose to say about the consequences of such litigation is that plaintiffs ought not obtain double recovery. See *ibid.* Congress said nothing to modify the background rule that where a state-court judgment precedes that of a federal

court, the federal court must give full faith and credit to the state-court judgment. See *Murphy* v. *Gallagher, supra,* at 884.

Finally, precedent supports the conclusion that the concerns underlying the grant of exclusive jurisdiction in § 27 are not undermined by state-court approval of settlements releasing Exchange Act claims. We have held that state-court proceedings may, in various ways, subsequently affect the litigation of exclusively federal claims without running afoul of the federal jurisdictional grant in question. In *Becher* v. *Contoure Laboratories, Inc.,* 279 U. S. 388 (1929) (cited in *Marrese,* 470 U. S., at 381), we held that state-court findings of fact were issue preclusive in federal patent suits. We did so with full recognition that "the logical conclusion from the establishing of [the state law] claim is that Becher's patent is void." 279 U. S., at 391. *Becher* reasoned that although "decrees validating or invalidating patents belong to the Courts of the United States," that "does not give sacrosanctity to facts that may be conclusive upon the question in issue." *Ibid.* Similarly, while binding legal determinations of rights and liabilities under the Exchange Act are for federal courts only, there is nothing sacred about the approval of settlements of suits arising under state law, even where the parties agree to release exclusively federal claims. See also *Brown* v. *Felsen,* 442 U. S., at 139, n. 10 (noting that "[i]f, in the course of adjudicating a state-law question, a state court should determine factual issues using standards identical to those of § 17, then collateral estoppel, in the absence of countervailing statutory policy, would bar relitigation of those issues in the bankruptcy court"); *Pratt* v. *Paris Gas Light & Coke Co.,* 168 U. S. 255, 258 (1897) (when a state court has jurisdiction of the parties and the subject matter of the complaint, the state court may decide the validity of a patent when that issue is raised as a defense).

We have also held that Exchange Act claims may be resolved by arbitration rather than litigation in federal court.

In *Shearson/American Express Inc.* v. *McMahon,* 482 U. S. 220 (1987), we found that parties to an arbitration agreement could waive the right to have their Exchange Act claims tried in federal court and agree to arbitrate the claims. *Id.,* at 227–228. It follows that state-court litigants ought also to be able to waive, or "release," the right to litigate Exchange Act claims in a federal forum as part of a settlement agreement. As *Shearson/American Express Inc.* demonstrates, a statute conferring exclusive federal jurisdiction for a certain class of claims does not necessarily require resolution of those claims in a federal court.

Taken together, these cases stand for the general proposition that even when exclusively federal claims are at stake, there is no "universal right to litigate a federal claim in a federal district court." *Allen* v. *McCurry,* 449 U. S., at 105. If class-action plaintiffs wish to preserve absolutely their right to litigate exclusively federal claims in federal court, they should either opt out of the settlement class or object to the release of any exclusively federal claims. In fact, some of the plaintiffs in the Delaware class action requested exclusion from the settlement class. They are now proceeding in federal court with their federal claims, unimpeded by the Delaware judgment.

In the end, §§ 27 and 1738 "do not pose an either-or proposition." *Connecticut Nat. Bank* v. *Germain,* 503 U. S. 249, 253 (1992). They can be reconciled by reading § 1738 to mandate full faith and credit of state-court judgments incorporating global settlements, provided the rendering court had jurisdiction over the underlying suit itself, and by reading § 27 to prohibit state courts from exercising jurisdiction over suits arising under the Exchange Act. Cf. 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4470, pp. 688–689 (1981) ("[S]ettlement of state court litigation has been held to defeat a subsequent federal action if the settlement was intended to apply to claims in exclusive federal jurisdiction as well as other claims. . . . These rulings

are surely correct"). Congress' intent to provide an exclusive federal forum for adjudication of suits to enforce the Exchange Act is clear enough. But we can find no suggestion in § 27 that Congress meant to override the "principles of comity and repose embodied in § 1738," *Kremer* v. *Chemical Constr. Corp.*, 456 U. S., at 463, by allowing plaintiffs with Exchange Act claims to release those claims in state court and then litigate them in federal court. We conclude that the Delaware courts would give the settlement judgment preclusive effect in a subsequent proceeding and, further, that § 27 did not effect a partial repeal of § 1738.

· C

The Court of Appeals did not engage in any analysis of Delaware law pursuant to § 1738. Rather, the Court of Appeals declined to apply § 1738 on the ground that where the rendering forum lacked jurisdiction over the subject matter or the parties, full faith and credit is not required. 50 F. 3d, at 661, 666. See *Underwriters Nat. Assurance Co.* v. *North Carolina Life & Accident & Health Ins. Guaranty Assn.*, 455 U. S. 691, 704–705 (1982) ("'[A] judgment of a court in one State is conclusive upon the merits in a court in another State only if the court in the first State had power to pass on the merits—had jurisdiction, that is, to render the judgment'") (quoting *Durfee* v. *Duke*, 375 U. S. 106, 110 (1963)). The Court of Appeals decided that the subject-matter jurisdiction exception to full faith and credit applies to this case because the Delaware court acted outside the bounds of its own jurisdiction in approving the settlement, since the settlement released exclusively federal claims. See 50 F. 3d, at 661–662, and n. 25.

As explained above, the state court in this case clearly possessed jurisdiction over the subject matter of the underlying suit and over the defendants. Only if this were not so—for instance, if the complaint alleged violations of the Exchange Act and the Delaware court rendered a judgment

on the merits of those claims—would the exception to § 1738 for lack of subject-matter jurisdiction apply. Where, as here, the rendering court in fact had subject-matter jurisdiction, the subject-matter-jurisdiction exception to full faith and credit is simply inapposite. In such a case, the relevance of a federal statute that provides for exclusive federal jurisdiction is not to the state court's possession of jurisdiction *per se*, but to the existence of a partial repeal of § 1738.[8]

\*     \*     \*

The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring in part and dissenting in part.

While I join Parts I, II–A, and II–C of the Court's opinion, and while I also agree with the Court's reasons for concluding that § 27 of the Securities Exchange Act of 1934 does not create an implied partial repeal of the Full Faith and Credit Act, I join neither Part II–B nor the Court's judgment because I agree with JUSTICE GINSBURG that the question of Delaware law should be addressed by the Court of Appeals in the first instance, and that the Ninth Circuit remains free to consider whether Delaware courts fully and fairly litigated the adequacy of class representation.

---

[8] *Kalb* v. *Feuerstein*, 308 U. S. 433 (1940), is not to the contrary. In that case, the federal statute at issue expressly prohibited certain common-law actions from being either instituted or maintained in state court. *Id.*, at 440–441. Thus, by merely entertaining a common-law foreclosure suit, over which it otherwise would have had jurisdiction, the state court violated the terms of the Act. That is not the situation here, where there is no contention that just by entertaining the class action the Delaware court acted in violation of federal law.

JUSTICE GINSBURG, with whom JUSTICE STEVENS joins, and with whom JUSTICE SOUTER joins as to Part II–B, concurring in part and dissenting in part.

I join the Court's judgment to the extent that it remands the case to the Ninth Circuit. I agree that a remand is in order because the Court of Appeals did not attend to this Court's reading of 28 U. S. C. § 1738 in a controlling decision, *Kremer* v. *Chemical Constr. Corp.*, 456 U. S. 461 (1982). But I would not endeavor, as the Court does, to speak the first word on the content of Delaware preclusion law. Instead, I would follow our standard practice of remitting that issue for decision, in the first instance, by the lower federal courts. See, *e. g.*, *Marrese* v. *American Academy of Orthopaedic Surgeons*, 470 U. S. 373, 387 (1985).

I write separately to emphasize a point key to the application of § 1738: A state-court judgment generally is not entitled to full faith and credit unless it satisfies the requirements of the Fourteenth Amendment's Due Process Clause. See *Kremer*, 456 U. S., at 482–483. In the class-action setting, adequate representation is among the due process ingredients that must be supplied if the judgment is to bind absent class members. See *Phillips Petroleum Co.* v. *Shutts*, 472 U. S. 797, 808, 812 (1985); *Prezant* v. *De Angelis*, 636 A. 2d 915, 923–924 (Del. 1994).

Suitors in this action (called the "Epstein plaintiffs" in this opinion), respondents here, argued before the Ninth Circuit, and again before this Court, that they cannot be bound by the Delaware settlement because they were not adequately represented by the Delaware class representatives. They contend that the Delaware representatives' willingness to release federal securities claims within the exclusive jurisdiction of the federal courts for a meager return to the class members, but a solid fee to the Delaware class attorneys, disserved the interests of the class, particularly, the absentees. The inadequacy of representation was apparent, the Epstein plaintiffs maintained, for at the time of the settle-

ment, the federal claims were *sub judice* in the proper forum for those claims—the federal judiciary. Although the Ninth Circuit decided the case without reaching the due process check on the full faith and credit obligation, that inquiry remains open for consideration on remand. See *ante*, at 379, n. 5 (due process "w[as] not the basis for the decision below," so the Court "need not address [it]").

## I

Matsushita's acquisition of MCA prompted litigation in state and federal courts. A brief account of that litigation will facilitate comprehension of the Epstein plaintiffs' position. On September 26, 1990, in response to reports in the financial press that Matsushita was negotiating to buy MCA, a suit was filed in the Court of Chancery of Delaware, a purported class action on behalf of the stockholders of MCA. Naming MCA and its directors (but not Matsushita) as defendants, the complaint invoked state law only. It alleged that MCA's directors had failed to carry out a market check to maximize shareholder value upon a change in corporate control, a check required by *Revlon, Inc.* v. *MacAndrews & Forbes Holdings, Inc.*, 506 A. 2d 173, 182 (Del. 1986). For this alleged breach of fiduciary duty, the complaint sought, *inter alia*, an injunction against Matsushita's proposed acquisition of MCA.

Matsushita announced its tender offer on November 26, 1990. It offered holders of MCA common stock $71 per share, if they tendered their shares before December 29, 1990. The owners of 91% of MCA's common stock tendered their shares and, on January 3, 1991, for a price of $6.1 billion, Matsushita acquired MCA.

On December 3, 1990, a few days after the required Securities and Exchange Commission (SEC) filings disclosed the terms of the tender offer, several MCA shareholders filed suit in the United States District Court for the Central Dis-

trict of California.[1]  Based solely on federal law, their complaints alleged that Matsushita, first named defendant, violated SEC Rules 14d–10, 17 CFR § 240.14d–10 (1994), and 10b–13, *id.*, § 240.10b–13, by offering preferential treatment in the tender offer to MCA principals Lew Wasserman and Sidney Sheinberg.  As stated in the complaint, the public tender offer included a special tax-driven stock swap arrangement for Wasserman, then MCA's chairman and chief executive officer, and a $21 million bonus for Sheinberg, then MCA's chief operating officer and owner of 1,170,000 shares of MCA common stock.  These arrangements allegedly violated, *inter alia,* the SEC's "all-holder best-price" rule (Rule 14d–10), which requires bidders to treat all shareholders on equal terms.  The claims of federal securities law violations fell within the exclusive jurisdiction of the federal court. See 15 U. S. C. § 78aa.  The Epstein plaintiffs also sought class certification to represent all MCA shareholders at the time of the tender offer.

Two days later, counsel in the Delaware action advised MCA's counsel that the Delaware plaintiffs intended to amend their complaint to include additional claims against MCA and its directors and to add Matsushita as a defendant. The additional claims alleged that MCA wasted corporate assets by increasing the corporation's exposure to liability for violation of Rules 10b–13 and 14d–10, that MCA failed to

---

[1] Two sets of plaintiffs filed complaints in the Central District of California: the Epstein plaintiffs (including Lawrence Epstein, John Linder, Jane Rockford, Maurice Karlin, Ruth Karlin, Beth Karlin, and Bert Karlin) sued both individually and on behalf of all MCA shareholders at the time of the tender offer; Walter Minton brought suit in his individual capacity. All had tendered their shares for the $71 tender price.  The District Court consolidated the two cases.  Minton and, it appears, Rockford opted out of the Delaware class-action settlement.  Matsushita does not contest the qualification of Minton and Rockford, as individuals, to pursue federal claims unimpeded by the settlement in Delaware.  See Brief for Petitioners ii.  Matsushita does contest any class-action initiative in federal court.

make full disclosure of the benefits MCA insiders would receive from the takeover, and that directors Wasserman and Sheinberg breached their fiduciary duties by negotiating preferential deals with Matsushita. Matsushita, the amended complaint alleged, had conspired with and aided and abetted MCA directors in violation of Delaware law.

Within days, the Delaware parties agreed to a settlement and, on December 17, 1990, submitted their proposal to the Delaware Vice Chancellor. The agreement provided for a modification of a "poison pill" in the corporate charter of an MCA subsidiary,[2] and for a fees payment of $1 million to the class counsel. The settlement agreement required the release of all claims, state and federal, arising out of the tender offer.

The Vice Chancellor rejected the settlement agreement on April 22, 1991, for two reasons: the absence of any monetary benefit to the class members; and the potential value of the federal claims that the agreement proposed to release. The "generous payment" of $1 million in counsel fees, the Vice Chancellor observed, "confer[red] no benefit on the members of the Class." *In re MCA, Inc. Shareholders Litigation*, 598 A. 2d 687, 695 (Del. Ch. 1991). And the value of the revised poison pill to the class, the Vice Chancellor said, was "illusionary[,] . . . apparently . . . proposed merely to justify a settlement which offers no real monetary benefit to the Class." *Id.*, at 696. The Vice Chancellor described the state-law claims as "at best, extremely weak and, therefore, [of] little or no value." *Id.*, at 694. "[T]he only claims which have any substantial merit," he said, "are the claims . . . in the California federal suit that were not asserted in this Delaware action." *Id.*, at 696. After the rejection of

---

[2] The subsidiary in question was spun off from MCA during the merger because it owned a television station that federal law prohibited Matsushita from acquiring. The $71 tender offer price included $5 worth of stock in this new corporation.

the settlement, the Delaware lawsuit lay dormant for more than a year.

The federal litigation proceeded. In various rulings, the District Court denied the federal plaintiffs' motion for partial summary judgment, denied the Epstein plaintiffs' motion for class certification, and granted Matsushita's motion for summary judgment dismissing the claims. On April 15, 1992, the District Court entered its final judgment, which the Epstein plaintiffs appealed to the Ninth Circuit.

On October 22, 1992, after the federal plaintiffs had filed their notice of appeal, the Delaware parties reached a second settlement agreement. Matsushita agreed to create a $2 million settlement fund that would afford shareholders 2 to 3 cents per share before payment of fees and costs. The Delaware class counsel requested $691,000 in fees. In return for this relief, the Delaware plaintiffs agreed to release "all claims, rights and causes of action (state or federal, including but not limited to claims arising under the federal securities laws, and any rules or regulations promulgated thereunder, or otherwise) . . . in connection with or that arise now or hereafter out of the [tender offer] . . . including without limitation the claims asserted in the California Federal Actions . . . ." App. 187–188. Unlike the first settlement proposal, the second agreement included an opt-out provision.

This time the Vice Chancellor approved the settlement. He stated: "[I]t is in the best interests of the class to settle this litigation and the terms of the settlement are fair and reasonable—although the value of the benefit to the class is meager." *In re MCA, Inc. Shareholders Litigation,* C. A. No. 11740, 1993 WL 43024, *1 (Del. Ch., Feb. 16, 1993). He found the class members' recovery of 2 to 3 cents per share "adequate (if only barely so) to support the proposed settlement." *Id.,* at *4. The federal claims, he reasoned, having been dismissed by the District Court, "now have minimal economic value." *Ibid.* And he gave weight to the pres-

ence in the second settlement agreement of an opt-out provision. *Ibid.*

Addressing the objectors' contention that the proposed settlement was "collusive," the Vice Chancellor recalled that "the settling parties ha[d] previously proposed a patently inadequate settlement," and he agreed that "suspicions abound." *Id.*, at *5. Nevertheless, he noted, the "[o]bjectors have offered no evidence of any collusion," so he declined to reject the settlement on that ground. *Ibid.* Reducing the counsel fees from the requested $691,000 to $250,000, the Vice Chancellor offered this observation: "[T]he defendants' willingness to create the settlement fund seems likely to have been motivated as much by their concern as to their potential liability under the federal claims as by their concern for liability under the state law claims which this Court characterized as 'extremely weak.'" *Id.*, at *6. In a brief order, the Delaware Supreme Court affirmed "on the basis of and for the reasons assigned by the Court of Chancery . . . ." *In re MCA, Inc. Shareholders Litigation,* C. A. No. 126,1993, 1993 WL 385041, *1 (Sept. 21, 1993), judgt. order reported at 633 A. 2d 370.

Before the Ninth Circuit, Matsushita argued that the Delaware class-action settlement barred litigation of the federal claims raised in the Epstein action. The Ninth Circuit disagreed. Relying on Federal Circuit Court decisions,[3] the Court of Appeals held that state courts lack plenary power to approve settlements that effectively extinguish exclusively federal claims. Only if federal and state claims rest on the "identical factual predicate," the Ninth Circuit concluded, could a state-court settlement subsume an exclusively federal claim. It was not enough, in the Ninth Circuit's view, that the discrete federal and state claims stem from the

---

[3] Closest in point, the court said, were *Grimes* v. *Vitalink Communications Corp.,* 17 F. 3d 1553 (CA3 1994), and *Nottingham Partners* v. *Trans-Lux Corp.,* 925 F. 2d 29 (CA1 1991). See *Epstein* v. *MCA, Inc.,* 50 F. 3d 644, 662 (CA9 1995).

"same transaction," the test Matsushita urged. 50 F. 3d, at 661–665. The federal securities claims did not turn on the same operative facts as the state claims pleaded in Delaware, the Ninth Circuit found; accordingly, the federal claims could not have been extinguished by the issue-preclusive effect of an adjudication of the state claims. This analysis led the Ninth Circuit to declare that the Delaware decree "exceed[ed] the jurisdiction of the state court and, therefore, is not entitled to full faith and credit." *Id.*, at 666.

On the merits, the Ninth Circuit held, first, that a private right of action could be maintained to redress Rule 14d–10 violations. *Id.*, at 652. The court next held that Matsushita violated Rule 14d–10 by paying Wasserman consideration not offered to other shareholders, *id.*, at 657; reversing the District Court's disposition of this matter, the Ninth Circuit held that plaintiffs were entitled to summary judgment on liability and remanded for a determination of damages, *ibid.* Regarding plaintiffs' claim that the $21 million payment to Sheinberg violated Rule 14d–10, the Ninth Circuit vacated the summary judgment for Matsushita and remanded for a determination whether the payment was in fact made to encourage Sheinberg to tender his shares. *Id.*, at 659.

## II

### A

Section 1738's full faith and credit instruction, as the Court indicates, requires the forum asked to recognize a judgment first to determine the preclusive effect the judgment would have in the rendering court. See *Kremer*, 456 U. S., at 466; *Marrese*, 470 U. S., at 381. Because the Ninth Circuit did not evaluate the preclusive effect of the Delaware judgment through the lens of that State's preclusion law, I would remand for that determination. See *id.*, at 386–387; *Migra* v. *Warren City School Dist. Bd. of Ed.*, 465 U. S. 75, 87 (1984) ("Prudence . . . dictates that it is the District Court, in the

first instance, not this Court, that should interpret Ohio preclusion law and apply it.").[4]

## B

Every State's law on the preclusiveness of judgments is pervasively affected by the supreme law of the land. To be valid in the rendition forum, and entitled to recognition nationally, a state court's judgment must measure up to the requirements of the Fourteenth Amendment's Due Process Clause. *Kremer*, 456 U. S., at 482–483. "A State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and other state and federal courts are not required to accord full faith and credit to such a judgment." *Id.*, at 482 (footnote omitted).

In *Phillips Petroleum Co.* v. *Shutts*, this Court listed minimal procedural due process requirements a class-action money judgment must meet if it is to bind absentees; those requirements include notice, an opportunity to be heard, a right to opt out, and adequate representation. 472 U. S., at 812. "[T]he Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members." *Ibid.* (citing *Hansberry* v. *Lee*, 311 U. S. 32, 42–43, 45 (1940)). As the *Shutts* Court's phrase "at all times" indicates, the class representative's duty to represent absent class members adequately is a continuing one. 472 U. S., at 812; see also *Gonzales* v. *Cassidy*, 474 F. 2d 67, 75 (CA5 1973) (representative's failure to pursue an appeal rendered initially adequate class representation inadequate, so that judgment did not bind the class).

Although emphasizing the constitutional significance of the adequate representation requirement, this Court has recog-

---

[4] In its endeavor to forecast Delaware preclusion law, the Court appears to have blended the "identical factual predicate" test applied by the Delaware Supreme Court in *Nottingham Partners* v. *Dana*, 564 A. 2d 1089, 1106–1107 (1989), with the broader "same transaction" test advanced by Matsushita. See *ante*, at 376–378.

nized the first line responsibility of the States themselves for assuring that the constitutional essentials are met. See *Hansberry*, 311 U. S., at 42.[5] Final judgments, however, remain vulnerable to collateral attack for failure to satisfy the adequate representation requirement. See *id.*, at 40, 42; see also Restatement (Second) of Judgments §§ 42(d) and (e); Comments *e* and *f*, pp. 406, 410–412 (1982) (noting, *inter alia*, that judgment is not binding on purportedly represented person where, to the knowledge of the opposing party, the representative seeks to advance his own interest at the expense of the represented person); see also *id.*, § 41, Comment *a*, p. 394 (if § 42 circumstances exist, "the represented person may avoid being bound *either* by appearing in the action before rendition of the judgment *or* by attacking the judgment by subsequent proceedings"). (Emphasis added.) A court conducting an action cannot predetermine the res judicata effect of the judgment; that effect can be tested only in a subsequent action. See 7B C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1789, p. 245 (2d ed. 1986).

In Delaware, the constitutional due process requirement of adequate representation is embodied in Delaware Court of Chancery's Rule 23, a class-action rule modeled on its federal counterpart. *Prezant*, 636 A. 2d, at 923, 920. Delaware requires, as a prerequisite to class certification, that the named

---

[5] Many States, including Delaware, have class-action rules corresponding to Federal Rule of Civil Procedure 23, a rule ranking adequacy of representation as a prerequisite to maintaining a class action. See 3 H. Newberg & A. Conte, Newberg on Class Actions, App. 13–1 (3d ed. 1992) (listing 39 States and the District of Columbia with rules comparable to the amended Federal Rule of Civil Procedure 23); Fed. Rule Civ. Proc. 23(a)(4) (representatives may sue on behalf of the class only if "the representative parties will fairly and adequately protect the interests of the class"); see also *General Telephone Co. of Southwest* v. *Falcon*, 457 U. S. 147, 157–158, n. 13 (1982) (Federal Rule of Civil Procedure 23(a)(4)'s adequate representation requirement "raises concerns about the competency of class counsel and conflicts of interest," in addition to the question whether the representative shares the interests of the class members).

plaintiffs "fairly and adequately protect the interests of the class." Del. Ch. Rule 23(a)(4). In *Prezant*, the Delaware Supreme Court considered whether adequate class representation was "a *sine qua non* for approval of a class action settlement," and concluded that it was. 636 A. 2d, at 920, 926. The state high court overturned a judgment and remanded a settlement because the Court of Chancery had failed to make an explicit finding of adequate representation. *Id.*, at 926.

The Delaware Supreme Court underscored that due process demands more than notice and an opportunity to opt out; adequate representation, too, that court emphasized, is an essential ingredient. *Id.*, at 924 (citing *Phillips Petroleum Co.* v. *Shutts*, 472 U. S., at 812). Notice, the Delaware Supreme Court reasoned, cannot substitute for the thorough examination and informed negotiation an adequate representative would pursue. *Prezant*, 636 A. 2d, at 924. The court also recognized that opt-out rights "are infrequently utilized and usually economically impracticable." *Ibid.*

The Vice Chancellor's evaluation of the merits of the settlement could not bridge the gap, the Delaware Supreme Court said, because an inadequate representative "taint[s]" the entire settlement process. *Id.*, at 925.[6] "[A]n adequate representative," the Delaware Supreme Court explained, "vigorously prosecuting an action without conflict and bargaining at arms-length, may present different facts and a

---

[6] In both *Prezant* and the instant case, a temporary settlement class device was used, telescoping the inquiry of adequate representation into the examination of the fairness of the settlement. According to the Delaware Supreme Court, however, this near simultaneity does *not* relieve the representative of her duty to demonstrate, nor the court of its duty to determine, the adequacy of representation. *Prezant*, 636 A. 2d, at 923. In a comprehensive opinion, the Third Circuit reached the same conclusion after examining the temporary class settlement device in the context of Federal Rule of Civil Procedure 23. See *In re General Motors Corp. Pick-up Truck Fuel Tank Products Liability Litigation*, 55 F. 3d 768, 794–800 (1995).

different settlement proposal to the court than would an inadequate representative." *Ibid.* Consequently, the Delaware Supreme Court held, "*in every class action settlement*, the Court of Chancery is required to make an explicit determination on the record of the propriety of the class action according to the requisites of Rule 23(a) and (b)." *Ibid.*

In the instant case, the Epstein plaintiffs challenge the preclusive effect of the Delaware settlement, arguing that the Vice Chancellor never in fact made the constitutionally required determination of adequate representation. See *id.*, at 923.[7] They contend that the state court left unresolved key questions: notably, did the class representatives share substantial common interests with the absent class members, and did counsel in Delaware vigorously press the interests of the class in negotiating the settlement.[8] In particular, the Epstein plaintiffs question whether the Delaware class representatives—who filed the state lawsuit on September 26, 1990, two months before the November 26 tender offer announcement—actually tendered shares in December, thereby enabling them to litigate a Rule 14d–10 claim in federal court. They also suggest that the Delaware representatives undervalued the federal claims—claims they could only settle, but never litigate, in a Delaware court. Finally,

---

[7] The Vice Chancellor did not have the benefit of the Delaware Supreme Court's clear statement in *Prezant,* decided one year after this settlement was approved. In *Prezant,* however, the Delaware Supreme Court largely reiterated and applied what this Court had stated almost a decade earlier in *Phillips Petroleum Co.* v. *Shutts,* 472 U. S. 797, 808, 812 (1985). See also 2 R. Balotti & J. Finkelstein, Delaware Law of Corporations and Business Organization § 13.22, p. 13–131, and n. 578 (2d ed. 1996 Supp.).

[8] The order approving the class for settlement purposes, the Epstein plaintiffs urge, contains no discussion of the adequacy of the representatives, see App. 198, and the order and final judgment approving the settlement contains only boilerplate language referring to the adequacy of representation, see *id.*, at 204–205. The Delaware Supreme Court approved the Court of Chancery's judgment in a one paragraph order. See *In re MCA, Inc. Shareholders Litigation,* 633 A. 2d 370 (1993) (judgt. order).

the Epstein plaintiffs contend that the Vice Chancellor improperly shifted the burden of proof;[9] he rejected the Delaware objectors' charges of "collusion" for want of evidence while acknowledging that "suspicions [of collusion] abound." *In re MCA, Inc. Shareholders Litigation,* 1993 WL 43024, at \*5.[10]

Mindful that this is a court of final review and not first view, I do not address the merits of the Epstein plaintiffs' contentions, or Matsushita's counterargument that the issue of adequate representation was resolved by full and fair litigation in the Delaware Court of Chancery.[11]   These arguments remain open for airing on remand.   I stress, however, the centrality of the procedural due process protection of adequate representation in class-action lawsuits, emphatically including those resolved by settlement.   See generally J. Coffee, Suspect Settlements in Securities Litigation, N. Y. L. J., March 28, 1991, p. 5, col. 1.

[9] Delaware law appears to place the burden of proof on the class representatives.   See 2 Balotti & Finkelstein, *supra,* at 11, n. 7, § 13–17, p. 13–121 (class representative must prove satisfaction of Del. Ch. Rule 23(a) requirements, including adequacy of representation); see also 7A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1765, pp. 273–274, and n. 29 (2d ed. 1986); 3B J. Moore, Moore's Federal Practice § 23.02–2 (2d ed. 1995).

[10] In this regard, it is noteworthy that Matsushita did not move to dismiss the Delaware action after the Vice Chancellor, in rejecting the first proposed settlement, surveyed the state-law claims and found them insubstantial.   See *In re MCA, Inc. Shareholders Litigation,* 598 A. 2d 687, 694 (Del. Ch. 1991) (Vice Chancellor described "the asserted state law claims" as "at best, extremely weak" and of "little or no value").

[11] Counsel for Matsushita acknowledged that relief from a judgment may be sought in Delaware pursuant to that State's counterpart to Federal Rule of Civil Procedure 60(b).   See Tr. of Oral Arg. 51–52; Del. Ch. Rule 60; see also 2 Newberg & Conte, *supra,* at 9, n. 5, §§ 11.27, 11.63 (Federal Rule of Civil Procedure 60(b) provides an avenue to challenge the adequacy of representation in a class settlement).