Marc S. WOLFERT, as Executor of the Estate of Elinor M. Wolfert, Plaintiff–Appellant,

v.

TRANSAMERICA HOME FIRST, INC. and Financial Freedom Senior Funding Corporation, Defendants–Appellees.

Docket No. 04–5519–CV.

United States Court of Appeals, Second Circuit.

Argued: Dec. 9, 2005.

Decided: Feb. 24, 2006.

Bob Green, Goshen, N.Y. (Neal D. Frishberg, Goshen, N.Y., on the brief), for Plaintiff–Appellant.

David C. Frederick, Washington, D.C. (Priya R. Aiyar, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C.; James H. Fleming, Reed Smith LLP, Oakland, Cal., on the brief), for Defendants–Appellees.

Before: NEWMAN, CABRANES, and HALL, Circuit Judges.

JON O. NEWMAN, Senior Circuit Judge.

This appeal presents due process challenges to the preclusive effect of a state court judgment approving a class action settlement. The challenges concern lack of adequate representation and deficiencies in notice of the settlement. Plaintiff–Appellant Marc S. Wolfert as Executor of the Estate of Elinor M. Wolfert ("Mrs. Wolfert") appeals from the September 16, 2004, judgment of the United States District Court for the Southern District of New York (Charles L. Brieant, Judge) dismissing her complaint as barred by res judicata. The complaint sought a declaratory judgment that the reverse mortgage entered into between Mrs. Wolfert and Defendant–Appellee Transamerica Home First, Inc. ("Transamerica") was unenforceable and return of all payments made to the lender. Mrs. Wolfert claimed that two provisions of the reverse mortgage, the "contingent interest" and the "maturity fee" were unlawful under New York law. Transamerica argued, successfully, that her claims were barred by a settlement in a class action in a California state court.

We conclude that Mrs. Wolfert was adequately represented in the California class action, that her challenges to the settlement notice lack merit, and that the California class action judgment therefore bars her current lawsuit. Accordingly, we affirm.

## Background

*The reverse mortgage.* In February 1996, at the age of 82, Mrs. Wolfert entered into a reverse mortgage with Transamerica. As explained by the District Court,

A reverse mortgage loan is a means by which an individual, usually an elderly person, may borrow on the equity of his

or her home, and the lender pays out so much of the loan proceeds as necessary, in agreed periodic installments over the individual's lifetime. The mortgage debt becomes due when the borrower either sells the property or dies, whichever occurs first.

Transamerica lent Mrs. Wolfert an initial amount of $94,987.14. It also agreed to loan her $100 per month for the next 96 months, or until March 1, 2004, as long as she remained alive and did not default on any of the other terms. The maximum total principal amount, as stated in the loan agreement, was $104,587.14. The loan provided for a fixed interest rate of 9.5 percent, compounded monthly. The reverse mortgage contract required Mrs. Wolfert to use part of the initial loan amount, $2,192.46, to purchase a life annuity with Metropolitan Life Insurance Company, which would begin monthly payments after the monthly advances under the loan agreement ended.

Two provisions of the reverse mortgage are especially pertinent to the pending litigation. The most controversial provision obligates the borrower to pay Transamerica a "Contingent Interest" upon various "Maturity Events," including the sale of the property.[1] The amount of the "Contingent Interest" is 50 percent of the difference between the appraised value of the property as of the date of the loan agreement and the time of the triggering event. Mrs. Wolfert's home was valued at $240,000 at the time of the loan and $686,000 at the time she tried to sell it in 2004. Thus, the amount of the "Contin-

gent Interest" she would have to pay if she sold the home would be half the difference, or $223,000.

The second controversial provision obligates the borrower to pay Transamerica a "Maturity Fee" of two percent of the value of the home at the time of sale.

*The California class action.* The Transamerica reverse mortgages were challenged in a class action in the Superior Court of San Mateo County, California. That action began as several separate actions in 1998 that challenged various aspects of Transamerica's reverse mortgages. These separate lawsuits were consolidated as the *Reverse Mortgage Cases.* In February 2002, the (then-putative) class representatives filed a third consolidated amended complaint, which stated three causes of action: (1) unlawful, unfair, or fraudulent business practices in violation of California Business & Professions Code § 17200 *et seq.;* (2) concealment/fraud; and (3) negligent misrepresentation. In September 2002, the California Superior Court granted a motion to certify a nationwide class only as to the first cause of action. The class comprised those who, prior to January 1, 1999, had entered into a reverse mortgage loan with Transamerica that charged identified fees concerning a 50 percent contingent interest, a deferred annuity premium, and/or a 2 percent maturity fee.[2] The class included legal successors-in-interest and heirs of deceased borrowers. Transamerica sold 1,588 of these reverse mortgages, of which 760 had been sold in California.

---

1. The other "Maturity Events" are the death of the borrower, the borrower no longer using the property as her primary residence, the date of mandatory prepayment due to default, or upon prepayment of the principal amount.

2. The fees were described as

(1) "Contingent Interest" of 50% of the appreciation in the value of the borrower's property between the date the loan was made and the date it became or becomes due; and (2) a premium for a deferred annuity acquired as part of the loan; and/or (3) a "Maturity Fee" of 2% of the value of the property at the loan's maturity.

In December 2002, the class representatives and the Defendants reached a settlement and sought court approval of the settlement and the class notice. After a hearing, the trial court gave preliminary approval to the settlement.

The settlement agreement provided for the Defendants to pay a total of $8 million. After legal fees, incentive payments to named plaintiffs, and administrative costs, approximately $5.28 million was available for distribution to class members. The agreement allocated this amount among the 3,422 borrowers (or their successors-in-interest) according to whether the loan was open or closed, the number of payments made with respect to closed loans, and the date the loan started with respect to open loans. Mrs. Wolfert expected to receive $2,600 in the settlement.

Class counsel mailed notice of the settlement in February 2003.[3] The notice comprises 13 pages of single-spaced text. On the first page, it identifies the borrower by name and loan number. On pages 5–7, it describes how each borrower's Settlement Share was calculated. On page 8, it describes the release each class member will provide to the Defendants:

> In particular, each class member will be completely releasing all claims, of any kind, he or she has now or may have in the future relating to the facts and claims alleged in the Action, including without limitation (1) the fairness of any of the terms or features of the loan and/or its accompanying annuity, (2) the disclosure or concealment of the loan's features, including its charges and fees and the cost of the annuity, and (3) the marketing of the loan, including its annuity.....

It should be noted that the claims which class members will be releasing as a condition of the settlement include, *but are not limited to,* the claims that the named plaintiffs have asserted in the Action and those that the Court has determined are suitable for class-wide treatment. The Released Claims also are not limited to claims arising under California law. The Released Claims include any claims of the described sort, even if the claim has not been asserted in the Action or is too individualized in its facts or relevant law to be suitable for class certification or uniquely arises under the laws of the borrower's home state.

[Proposed] Notice of Class Action and Settlement at 8–9 (emphasis in original). The notice stated that "the full Settlement Agreement" was available "for inspection ... during regular business hours at the Office of the Clerk of the Superior Court, San Mateo, California." The notice also refers the reader to an Internet address, www.gilardi.com, at which "the Settlement Agreement" was to have appeared. In addition, the Claims Administrator published an advertisement once a week for four consecutive weeks in the business section of USA Today.

The Settlement Agreement is a 29-page, double-spaced document. The release clause uses similar, but not identical, language to that appearing in the Notice:

> Effective as of the Final Effective Date, [the class members] hereby forever completely release and discharge each of the Defendants ... from any and all causes of action ... *arising now or in the future out of or in connection with or related to* the facts and claims alleged or

---

**3.** Class counsel sent one version of the notice on January 31, 2003. Upon discovering that they had sent an earlier draft of the notice instead of the court-approved version, class counsel sent the correct notice on February 12, 2003. The trial court ratified this course of action on March 4, 2003.

asserted in any of the complaints filed in the Litigation ... under federal law or the law of any state or locality, including consumer protection laws (the "Released Claims"). The Released Claims include without limitation any claim ... that any of the terms of the Reverse Mortgage Loans or annuities were unfair or unlawful ....

Settlement Agreement and Release at 19–20 (emphasis added). The Settlement Agreement states that the Defendants will pay $8 million in total to settle the claims. The agreement also provides that the Defendants would not oppose class counsels' request for an attorney fee award of 29 percent of the settlement amount. The agreement also provides for incentive awards for each of the named plaintiffs in the amount of $10,000 for all but one, who received $2,500. The agreement refers to a Plan of Allocation for the award as Exhibit B to the agreement, but this plan does not appear in the record or on the Internet.

The trial court held a fairness hearing in May 2003. One class member filed an objection, and 18 opted out. Mrs. Wolfert neither objected nor opted out. The trial court rejected all the objections and gave final approval to the settlement in June 2003. In March 2004, the California Court of Appeal affirmed the judgment of the trial court, and the California Supreme Court denied review in July 2004.

*The Pending Litigation.* Upon learning that before closing on a proposed sale of her house, Mrs. Wolfert would be obligated to pay one of Transamerica's affiliated companies approximately $450,000 to discharge her loan, she filed a suit in the New York Supreme Court (Orange County) in March 2004, seeking an injunction requiring Transamerica to file a Satisfaction of Mortgage. Transamerica removed the case to the District Court for the Southern District of New York. Mrs. Wolfert then filed an eight-count complaint in the District Court in April 2004, seeking damages and return of the payment required to discharge her loan upon the sale of her home. The eight counts alleged that: (1) the "Contingent Interest" provision violated New York law because it exceeded allowable "future appreciation" interest that may be charged to someone of Mrs. Wolfert's age, (2) the "Maturity Fee" provision violated New York law because it was an unlawful form of "equity participation," (3) the "Maturity Fee" violated New York law because it did not represent actual fees and costs, (4) the initial appraisal fraudulently undervalued Mrs. Wolfert's property, (5) the Defendants failed to meet their obligations under the agreement, (6) the Reverse Mortgage was unconscionable, (7) Mrs. Wolfert was physically and mentally infirm at the time of making the contract, and (8) the Defendants had engaged in fraud and deception entitling Mrs. Wolfert to rescission of the contract.

Transamerica responded with a motion to dismiss, or in the alternative to stay pending arbitration. Transamerica contended that (1) Mrs. Wolfert's claims are barred by res judicata, (2) the New York statutes governing reverse mortgages are preempted by federal law, (3) the reverse mortgage complied with New York law, and (4) any action must be stayed pending arbitration.

In July 2004, the District Court ruled that res judicata, based on the judgment in the California state court class action, barred most of Mrs. Wolfert's claims. Judge Brieant noted that class notice was sent by first class mail and that Mrs. Wolfert received the notice.[4] The District Court then observed that Mrs. Wolfert had

---

**4.** Judge Brieant also noted that constructive

notice, sufficient to satisfy due process, *see*

failed to opt out and concluded that she was bound by the judgment of the California court. Judge Brieant dismissed six of the eight claims as "barred by claim preclusion arising out of the California judgment." He did not dismiss the two remaining claims—for breach of contract for failure to make monthly payments, and incapacity of Mrs. Wolfert to enter into a contract—because they did not fall within the scope of the class action release. He also declined to stay the matter pending arbitration, noting that the validity of the arbitration clause depended upon contested factual issues.[5]

In September 2004, the District Court dismissed Mrs. Wolfert's two remaining claims with prejudice, pursuant to a stipulation by both parties, and then dismissed the entire action.

### Discussion

The Appellant contends that the District Court erred in giving the California judgment preclusive effect because, she claims, the class representatives did not adequately represent her and the notice was deficient in several respects.

### I. Claim of Inadequate Representation

■ Judge Brieant does not appear to have given explicit consideration to wheth-

er Mrs. Wolfert was adequately represented. He noted that "Her transaction clearly brings her within the class as defined," that her first, second, third, fourth, sixth, and eighth claims "allege conduct that falls within the scope of the released claims," that she received notice, and that she failed to opt out. "[T]hus," he concluded, "her claims in this lawsuit are precluded."

In 1940, the Supreme Court first considered whether giving preclusive effect to a judgment in a class action against an absent class member violated the Due Process Clause of the Fourteenth Amendment. *See Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). The Court initially stated that its task was to assure that the absent class member "has been afforded such notice and opportunity to be heard as are requisite to the due process which the Constitution prescribes." *Id.* at 40, 61 S.Ct. 115. Had the Court stopped there, an absent class member might have been precluded simply by a judgment rendered after a class action court had given class members adequate notice of settlement terms and afforded them an opportunity to be heard in opposition to the settlement.[6] However, relying on early equity jurisprudence, *see id.* at

Phillips Petroleum Co. v. Shutts, *472 U.S. 797, 808, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), was provided by publication of the notice for four consecutive weeks in the national edition of* USA Today.

5. On this appeal, Transamerica advances its claim for a stay pending arbitration only as a fall-back position in the event Mrs. Wolfert's complaint is re-instated.

6. Under such a regime, an absent class member receiving adequate notice, even if not adequately represented, would have had to object in the class action court in order to avoid the preclusive effect of the class action judgment. The virtue of such a regime would have been the presentation of all objections,

including lack of adequate representation, to the court familiar with the class action. The shortcoming would have been the inconvenience of obliging inadequately represented absent class members to litigate their concern in a distant court, rather than a local court in which the class action judgment is sought to be enforced against them or collaterally challenged by them. *Cf. Penn–Central Merger and N & W Inclusion Cases*, 389 U.S. 486, 543 n. 9, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968) (Douglas, J., dissenting in part) ("I can find no authority for a rule which would require a party not under the jurisdiction of the inviting court to respond affirmatively to an invitation to intervene or else be bound by an adverse decision."). The subsequent development of

41–42, 61 S.Ct. 115, the Court further stated that the class action judgment would have preclusive effect on absent class members only if "those present are of the same class as those absent and ... the litigation is so conducted as to insure the full and fair consideration of the common issue." *Id.* at 43, 61 S.Ct. 115. The Court also referred to the "familiar doctrine of the federal courts that members of a class not present as parties to the litigation may be bound by the judgment where they are in fact adequately represented by parties who are present ...." *Id.* at 42–43, 61 S.Ct. 115.[7] The Court concluded that the class action judgment in *Hansberry* would not have preclusive effect because the interests of the representatives in that suit "[we]re not necessarily or even probably the same as those whom they [we]re deemed to represent," and therefore "d[id] not afford that protection to absent parties which due process requires." *Id.* at 45, 61 S.Ct. 115.

By 1985, the Court could state emphatically, "[T]he Due Process Clause of course requires that the named plaintiff [in a class action] at all times adequately represent the interests of the absent class members." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); *accord Nevada v. United States,* 463 U.S. 110, 135 n. 15, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983) (citing *Hansberry* for the proposition that absent class members could not be bound where the class representatives "had interests that impermissibly conflicted with those of persons represented").

*Hansberry* decided not only that due process requires fair representation of absent parties (ultimately called "adequate" representation), but also that an absent party denied such representation could collaterally attack the class action judgment. That proposition remains fully effective. "Final judgments ... remain vulnerable to collateral attack for failure to satisfy the adequate representation requirement." *Matsushita Electric Industrial Co. v. Epstein,* 516 U.S. 367, 396, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996) (Ginsburg, J., concurring in part and dissenting in part). This circuit, and many others, have allowed such collateral attacks in recent years. *See Stephenson v. Dow Chemical Co.,* 273 F.3d 249, 260 (2d Cir.2001), *aff'd in part by an equally divided court and vacated in part,* 539 U.S. 111, 123 S.Ct. 2161, 156 L.Ed.2d 106 (2003); *In re Agent Orange Product Liability Litigation,* 996 F.2d 1425, 1435 (2d Cir.1993); *In re Real Estate Title and Settlement Services Antitrust Litigation,* 869 F.2d 760 (3d Cir.1989); *Gonzales v. Cassidy,* 474 F.2d 67, 72 (5th Cir.1973); *see generally* Patrick Woolley, *The Availability of Collateral Attack for Inadequate Representation in Class Suits,* 79 Tex. L.Rev. 383, 384–86 & nn.1–9 (2000). Thus, Mrs. Wolfert's due process challenge to the preclusive effect of the California judgment depends on whether she was adequately represented by the class representatives.

In considering Mrs. Wolfert's claim of inadequate representation, we face an initial issue of the degree of deference we owe the ruling of the class action court that the class representatives provided adequate representation to the class. Conflicting views on that issue have been

---

adequate representation as a due process requirement for enforcement of a class action judgment has mooted this issue.

**7.** For federal class actions, Rule 23 of the Federal Rules of Civil Procedure, adopted in

1937, required and still requires that "the representative parties will fairly and *adequately* protect the interests of the class." Fed. R.Civ.P. 23(a)(4) (emphasis added).

forcefully set forth in the majority and dissenting opinions in *Epstein v. MCA, Inc.,* 179 F.3d 641 (9th Cir.1999), on remand from the Supreme Court, *see Matsushita,* 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996). Judge O'Scannlain, for the majority, appeared to state broadly that the class action court's decision on adequacy of representation precluded a subsequent collateral attack. *Epstein,* 179 F.3d at 648 ("Simply put, the absent class members' due process right to adequate representation is protected not by collateral review, but by the [Delaware] certifying court initially, and thereafter by appeal within the state system and by direct review in the United States Supreme Court."). In dissent, Judge Thomas maintained that collateral attack was available because "the [collaterally attacking] plaintiffs seek to raise claims that received neither determination nor review in the Delaware courts." *Id.* at 656.

■ As with most issues arising under the Due Process Clause, the ultimate test of whether an adequacy-of-representation ruling by a class action court precludes a collateral attack turns on whether fundamental fairness was lacking. In the class action context, if the class action court ruled only in general terms that representation was adequate, without any adversarial consideration of the claim now advanced by Mrs. Wolfert that New York law affords her substantial rights beyond those afforded by California law, it would be manifestly unfair to preclude her collateral attack. On the other hand, if, in the class action, a defendant opposing class certification or an objector to the settlement had made a serious argument that a sub-class was required because of claims substantially similar to hers, and that argument had been considered and rejected by the class action court, it would not be unfair to preclude collateral review of that ruling and relegate Mrs. Wolfert to her direct review remedies.[8] It would not be a denial of due process to give full faith and credit to the class action court's ruling on adequacy of representation unless that ruling was made in the absence of an adversarial presentation of the claim that interests substantially similar to those of Mrs. Wolfert's required the designation of a sub-class. However, no such adversarial presentation occurred with respect to her claim that New York law affords her materially more rights than those available under California law. Although the class action court considered and rejected, at the class certification stage, Transamerica's contention that the contract's choice of law provision specifying New York law should be followed,[9] no one made any claim concerning the content of New York law.[10]

---

8. The concurring judge in *Epstein* expressed the view that the adequacy-of-representation ruling by the state court was entitled to full faith and credit precisely because the class action court had considered and rejected objectors' specific contention that the collusive nature of the settlement was inconsistent with adequate representation of the class. 179 F.3d at 650–51 & n. 1 (Wiggins, J., concurring).

9. The class representatives contended, and the class action court implicitly agreed, that the choice of law provision should not be followed in a contract of adhesion.

10. Transamerica argues that the presence of a named New York plaintiff protected the interests of the New York members of the class. However, the existence of antagonistic groups within the class is not remedied by naming as a representative a member of one of those antagonistic groups. In *Amchem Products Inc. v. Windsor,* 521 U.S. 621, 627, 117 S.Ct. 2231 (1997), the Supreme Court quoted approvingly the following language from our decision in *In re Joint Eastern and Southern District Asbestos Litigation,* 982 F.2d 721, 743 (2d Cir.1992), *modified on rehearing on other grounds sub nom. In re Findley,* 993 F.2d 7

Of course, not every variation between the interests of an absent class member and those of the class generally will render the class representatives inadequate. The adequacy-of-representation determination turns on whether the interests of the class were "compatible" with those of the party attempting to attack the class action judgment collaterally. *See Wal–Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 110 (2d Cir.2005); *see also In re Joint Eastern and Southern District Asbestos Litigation*, 78 F.3d 764, 778 (2d Cir.1996) (explaining that for representation to be adequate pursuant to Federal Rule of Civil Procedure 23(a)(4), class counsel must satisfy certain criteria and " 'the class members must not have interests that are antagonistic to one another' " (quoting *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992))). In assessing compatibility, we look at "alignment of interests of class members" *Walmart*, 396 F.3d at 113; *see Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Stephenson*, 273 F.3d at 260–61. There is no litmus test for determining when interests of one or more absent class members are sufficiently distinct from those of the class representatives to render those representatives inadequate. In *Hansberry*, the interests of the absent class members and those of the class representatives were diametrically opposed. *Hansberry*, 311 U.S. at 45–46, 61 S.Ct. 115 ("In seeking to enforce the agreement the plaintiffs in [the class] suit were not repre-

senting the [collaterally attacking parties] whose substantial interest is in resisting performance."). Without attempting to delineate the degree of divergence of interests that would render class representatives inadequate, it suffices to note in this case that if Mrs. Wolfert is correct that New York law affords her significant protection not available under California law, she was not adequately represented.

Mrs. Wolfert asserts that under New York law the "contingent interest" clause was capped at a 20 percent interest, rather than the 50 percent in her loan. In contrast, the class representatives relied upon the general California unfair business practice statute, notwithstanding a choice-of-law provision for New York state borrowers, which provided that New York law governed disputes, and acknowledged in their settlement notice that one of the difficulties they would face at trial was in proving that this clause was not "fair."

Determining whether New York law provides Mrs. Wolfert with greater protection than the class representatives were claiming under California law requires examination of New York's statutes governing reverse mortgages.

In 1993, New York revised its Reverse Mortgage statute, creating two separate sections, each covering different types of reverse mortgages. *See* N.Y. Real Prop. L. §§ 280, 280–a (McKinney 2005 Supp.). Section 280 applies to reverse mortgages for all persons 60 or older; section 280–a

(1993) *("Joint Eastern ")*: "[W]here differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of distinct subgroups." Even though one of the named representatives, Margaret Mickey as co-executrix of the estate of Kathleen Maloney, could have asserted claims pursuant to New York law, she did not

satisfy the adequacy requirement because she did not "represent solely the members of [her] respective subgroup[ ]." *Id.*

We note that *Amchem* appears to have abrogated the suggestion in *Joint Eastern* that the lack of needed sub-classes could be remedied by an opt-out opportunity. *See* 982 F.2d at 745. *Amchem* required sub-classes even though the unitary class was an opt-out class. *See Amchem*, 521 U.S. at 605, 117 S.Ct. 2231.

applies to reverse mortgage only for those aged 70 or older. Section 280–a loans require several additional protections for the borrowers, such as guaranteeing lifetime occupancy. *See id.* § 280–a(2)(a). Pertinent to Mrs. Wolfert's claim, section 280–a sets a 20 percent cap on the lender's interest in the future appreciation in the home. *See id.* § 280–a(2)(d). Section 280 does not contain such a cap.

Although Mrs. Wolfert had a section 280 mortgage and does not claim that New York law gives more rights to the borrower with a section 280 mortgage than are available under California law, she nonetheless contends that New York law affords her a basis, not found in California law, to declare her section 280 mortgage void and thereby avoid the contingent interest payment and maturity fee payment for which she became liable upon the sale of her home. The premise of her argument is that Transamerica failed to comply with a statutory provision requiring a lender to offer section 280–a reverse mortgages in equal number to section 280 reverse mortgages. *See id.* § 280(10). Mrs. Wolfert alleges, and Transamerica does not dispute, that it did not offer any section 280–a loans at the relevant time.

■ We agree with Transamerica that failure to comply with the 50–50 requirement does not afford Mrs. Wolfert a basis to challenge her section 280 mortgage as either void *ab initio* or voidable because the provision imposing the 50–50 requirement does not create a private right of action. The provision does not explicitly authorize a private right of action, and cannot be considered to imply one because

the 50–50 requirement is not realistically amenable to enforcement by a borrower's lawsuit. When a lender fails to abide by the 50–50 requirement, which borrowers with section 280 mortgages would be entitled to relief? For example, if, at the end of a calendar year,[11] a lender has issued 60 section 280 mortgages and only 40 section 280–a mortgages, 10 of the section 280 mortgages should have been 280–a mortgages, but which ones? Allowing all 60 borrowers with section 280 mortgages to invalidate their mortgage loans would give 50 borrowers relief to which they are not entitled. The statute provides no basis for determining which section 280 borrowers could sue to enforce the 50–50 requirement. If a lender fails to comply with the 50–50 requirement, the remedy lies with administrative action in the discretion of the Superintendent of Banks.[12] *See* 3 N.Y. Comp.Code R. & Regs. § 79.13; *see also Brian Hoxie's Painting Co. v. Cato–Meridian Central School District,* 76 N.Y.2d 207, 212–13, 557 N.Y.S.2d 280, 556 N.E.2d 1087, 1089–90 (1990) (statutory creation of enforcement scheme suggests absence of private right of action).

■ Mrs. Wolfert also contends that her reverse mortgage is voidable because it violates New York's usury statute. *See* N.Y. Gen. Oblig. L. § 5–511 (McKinney 2005). The premise of this argument is that a lender offering only one reverse mortgage program must meet the requirements of a section 280–a loan for all loans and that the 50 percent contingent interest of her section 280 loan exceeded the maximum 20 percent contingent interest of a

---

**11.** The 50–50 division is to be determined on a calendar year basis. *See* 3 N.Y. Comp.Code R. & Regs. § 79.12(a) (2005).

**12.** Transamerica also contends that New York law provided an exemption from the 50–50

requirement if government or private insurance was not available at the time. *See* 3 N.Y. Comp.Code R. & Regs. 79.12(a). However, the record does not indicate whether insurance was available.

section 280–a loan.[13] She then argues that determining whether Transamerica charged more than the maximum interest rate set by the usury statute requires incorporating this excess into a calculation of the interest rate charged. "In effect," she contends, "the interest charged [her] was in excess of 37% per annum." Br. for Appellant at 11.

We agree with Transamerica that, insofar as Mrs. Wolfert claims that these charges effectively violate New York's usury statute, the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDMCA"), 12 U.S.C. § 1735f–7a(a)(1), preempts her claim. That section provides, in relevant part:

> The provisions of the constitution or the laws of any State expressly limiting the rate or amount of interest, discount points, finance charges, or other charges which may be charged, taken, received, or reserved shall not apply to any loan, mortgage, credit sale, or advance which is—
>
> (A) secured by a first lien on residential real property, by a first lien on all stock allocated to a dwelling unit in a residential cooperative housing corporation, or by a first lien on a residential manufactured home;
>
> (B) made after March 31, 1980; and
>
> (C) described in section 527(b) of the National Housing Act (12 U.S.C. 1735f–5(b)) . . . .

*Id.*

■ Accordingly, DIDMCA preempts state usury laws to the extent that those laws "expressly limit[ ] the rate or amount of interest" that a borrower may be charged. *Id.; Brown v. Investors Mort-*

*gage Co.,* 121 F.3d 472 (9th Cir.1997) (Washington usury law); *Smith v. Fidelity Consumer Discount Co.,* 898 F.2d 907 (3d Cir.1990) (Pennsylvania usury law); *In re Lawson Square, Inc.,* 816 F.2d 1236 (8th Cir.1987) (holding that DIDMCA, not Arkansas statutes, applied to mortgage interest rates); *cf. Grunbeck v. Dime Savings Bank of New York,* 74 F.3d 331 (1st Cir. 1996) (determining that DIDMCA did not preempt a New Hampshire statute that required interest to be computed on a simple interest basis rather than a compound interest basis but that did not limit the amount of interest to be charged). Therefore, the DIDMCA preempts Mrs. Wolfert's claim that these charges create an effective interest rate that exceeds the limit of New York's usury law.

Moreover, although the scope of DIDMCA preemption is a matter of federal law, New York banking regulations are instructive in that they consider the contingent interest fee not to be interest under New York usury law. *See* 3 N.Y. Comp.Code R. & Regs. §§ 79.6(b), 79.7(c) ("Such appreciation shall not be considered interest for purposes of any law regulating the maximum rate of interest which may be charged, taken or received, including pursuant to sections 190.40 and 190.42 of the Penal Law."). Therefore, New York law does not support Mrs. Wolfert's claim that the usury law operates in the manner urged. Accordingly, her mortgage is not voidable pursuant to the New York usury law.

## II. The Claim of Deficiencies in the Notice

The Appellant argues that the notice was defective for three reasons: (1) the

---

**13.** Mrs. Wolfert's claim with respect to the legality of the two percent "maturity fee" relies on a similar analysis—that the effective rate of interest charged by Transamerica exceeded the maximum rate in the usury statute. We reject this claim for the same reasons we reject the claim concerning the contingent interest fee.

notice should have been sent by certified mail to ensure delivery; (2) the notice should have also been sent to her son, as required by both the California trial court and her loan documents; and (3) the notice deceived class members by failing to alert them that they were relinquishing valuable claims under state law. We reject all three contentions.

■ The Appellant claims entitlement to notice by certified mail because the average value of each claim in this case, approximately $2,000, was much higher than the $100 in *Shutts*, 472 U.S. at 809, 105 S.Ct. 2965, in which first-class mail was ruled sufficient to satisfy due process, *id.* at 812, 105 S.Ct. 2965. The ruling in *Shutts*, however, was not linked to the amount of the claim, and use of first-class mail to send a required notice has regularly been upheld. *See Weigner v. City of New York*, 852 F.2d 646, 650–52 (2d Cir. 1988) (rejecting argument that due process requires use of certified mail in a tax lien foreclosure action); *Zimmer Paper Products, Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 91 (3d Cir.1985) ("[T]he only decision we have found that even discusses the relative merits of first-class and certified mail in the notice context expressly reaffirms the adequacy of first-class mail." (citing *Cayuga Indian Nation v. Carey*, 89 F.R.D. 627, 632–33 (N.D.N.Y.1981)). Moreover, the Claims Administrator also published notice in short form in *USA Today* on four occasions over a four-week span. *Cf. Weigner*, 852 F.2d at 651.

The Appellant next contends that the Claims Administrator breached the terms of the California court's order by failing to send the notice to her son. Mrs. Wolfert relies upon a clause of the court-approved Settlement Agreement, which requires the defendants to furnish to class counsel the names of any personal contacts listed on the loan. The agreement, however, does not require that the Claims Administrator send notice to those personal contacts. It requires mailing only to "all Settlement Class members," which is defined as the borrowers or their successors-in-interest at the time of the settlement. The reverse mortgage agreement designated Mrs. Wolfert's son only for the purpose of receiving certain notices of default. The California court's order did not require notice of the settlement to be sent to the son.

■ Finally, the Appellant argues that the notice failed to sufficiently advise class members that they were losing the right to sue under state law. However, the notice states, "The Released Claims include any claims of the described sort, even if the claim has not been asserted in the Action or is too individualized in its facts or relevant law to be suitable for class certification or *uniquely arises under the laws of the borrower's home state.*" [Proposed] Notice of Class Action and Settlement at 8–9 (emphasis added). The notice adequately warned that state law claims were being released in the settlement.

Accordingly, the settlement notice in the class action case did not violate due process.

### Conclusion

Because the District Court correctly ruled that the judgment in the California class action precluded Mrs. Wolfert's claims, the judgment of the District Court is affirmed.