*288 Justice Scalia,
with whom The Chief Justice, Justice Thomas, and Justice Alito join, dissenting.
In the Fair Sentencing Act of 2010, 124 Stat. 2372, Congress increased the threshold quantities of crack cocaine required to trigger the 5- and 10-year mandatory minimum penalties associated with offenses involving the manufacture, distribution, or dispensation of the drug, and eliminated the 5-year mandatory minimum previously associated with simple possession of it. The Act is silent as to whether these changes apply to defendants who committed their offenses before, but whose sentencing proceedings occurred after, its August 3, 2010, effective date. In my view, the general saving statute, 1 U. S. C. § 109, dictates that the new, more lenient mandatory minimum provisions do not apply to such preenactment offenders.
I
The Court starts off on the right foot by acknowledging, ante, at 272-273, that the ameliorative amendments at issue here trigger application of the general saving statute. Enacted in 1871 to reverse the common-law rule that the repeal or amendment of a criminal statute would abate all nonfinal convictions under the repealed or amended statute, see Warden v. Marrero, 417 U. S. 653, 660 (1974), the saving statute provides in relevant part:
“The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.” 1 U. S. C. § 109.
By reducing the statutory penalties for crack cocaine offenses, the Fair Sentencing Act “repealed]” the former penalties; for defendants who committed their offenses (and *289 hence “incurred” the penalties) while the prior law was in force, §109 directs that the prior law “shall be treated as still remaining in force.”
Although § 109 purports to require that subsequent legislation opting out of its default rule must do so “expressly,” the Court correctly observes, ante, at 274, that express-statement requirements of this sort are ineffective. See Lockhart v. United States, 546 U. S. 142, 147-150 (2005) (Scalia, J., concurring). Because “one legislature cannot abridge the powers of a succeeding legislature,” Fletcher v. Peck, 6 Cranch 87, 135 (1810), a statute is “alterable when the legislature shall please to alter it,” Marbury v. Madison, 1 Cranch 137, 177 (1803). Consequently, the express-statement requirement of § 109 is itself subject to repeal on the same terms as any other statute, which is to say that a repeal may be accomplished by implication. See, e. g., Marrero, supra, at 659-660, n. 10; Great Northern R. Co. v. United States, 208 U. S. 452, 465 (1908).
Understanding the interpretive problem posed by these cases as one of implied repeal helps to explain the Court’s observation, ante, at 274-275, that what is required to override § 109’s default rule is a clear demonstration of congressional intent to do so. Admittedly, our cases have not spoken with the utmost clarity on this point. In Marrero, for example, we suggested that a “fair implication” from a subsequently enacted statute would suffice, 417 U. S., at 660, n. 10, while in Hertz v. Woodman, 218 U. S. 205 (1910), we used the phrase “clear implication,” id., at 218 (emphasis added); see also ibid, (“plain implication”). In Great Northern R. Co., we split the difference, stating at one point that § 109 controls unless Congress expresses a contrary intention “either expressly or by necessary implication in a subsequent enactment,” 208 U. S., at 465 (emphasis added), but suggesting at another point that a “fair implication,” id., at 466, would do. In my view, the “fair implication” formulation understates the burden properly imposed on a defendant who would *290 claim an implicit exception from § 109⅛ terms. Because the effect of such an exception is to work a pro tanto repeal of §109’s application to the defendant’s ease, the implication from the subsequently enacted statute must be clear enough to overcome our strong presumption against implied repeals. See, e. g., Matsushita Elec. Industrial Co. v. Epstein, 516 U. S. 367, 381 (1996); Posadas v. National City Bank, 296 U. S. 497, 503 (1936). Thus, we should conclude that Congress has deviated from § 109 (or any similar statute establishing a background interpretive principle) only when the “plain import of a later statute directly conflicts” with it, Lockhart, supra, at 149 (Scalia, J., concurring) (emphasis added).
II
A
The considerations relied upon by the Court do not come close to satisfying the demanding standard for repeal by implication. As an initial matter, there is no persuasive force whatever to the Court’s observation that continuing to apply the prior mandatory mínimums to preenactment offenders would “involve imposing upon the pre-Act offender a pre-Act sentence at a time after Congress had specifically found in the Fair Sentencing Act that such a sentence was unfairly long.” Ante, at 277. That is true whenever Congress reduces a criminal penalty, and so is a consequence that Congress affirmatively embraced when it said in § 109 that ameliorative amendments to criminal statutes do not apply to preenactment conduct. Nor does it matter that Congress has instructed district courts, when applying the Federal Sentencing Guidelines, to apply the version in force on the date of sentencing, with the object of reducing disparities in sentences between similar defendants who are sentenced for the same conduct at the same time. See 18 U. S. C. § 3553(a)(4)(A)(ii). The presumption against implied repeals requires us to give effect, -if possible, to both *291 § 3553(a)(4)(A)(ii) and § 109. “The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.” Morton v. Mancari, 417 U. S. 535, 551 (1974). We may readily do so here by holding that § 3553(a)(4)(A)(ii) applies to Guidelines amendments, and § 109 to statutory ones.
The Court also stresses that the Fair Sentencing Act instructs the Sentencing Commission to promulgate “as soon as practicable” (and not later than 90 days after August 3, 2010) “such conforming amendments” to the Sentencing Guidelines “as the Commission determines necessary to achieve consistency with other guideline provisions and applicable law.” § 8, 124 Stat. 2374. The argument goes that, because the Commission implemented this directive by reducing the Guidelines ranges for crack cocaine offenses to track the 18-to-l erack-to-powder ratio reflected in the new mandatory minimums, see 75 Fed. Reg. 66191 (2010), and because the general rule is that a sentencing court should apply the version of the Guidelines in effect at the time of sentencing, see 18 U. S. C. § 3553(a)(4)(A)(ii), Congress must have understood that the new mandatory minimums would apply immediately, since otherwise there would be a mismatch between the statutory penalties and Guidelines ranges.
That conclusion simply does not follow. For one thing, the argument begs the very question presented here: What is the “applicable law” relevant to preenactment offenders who are sentenced after enactment? The Commission could well have answered this question by concluding that, in light of § 109, the law applicable to such offenders is the pre-Act mandatory minimums. It might therefore have retained, as to those offenders, the existing Guidelines ranges reflecting a higher crack-to-powder ratio. Although rare, it is not unheard of for the Commission to establish Guidelines whose application turns on the date of commission of the defend *292 ant’s offense. See United States Sentencing Commission, Guidelines Manual § 5E1.1(g)(1) (Nov. 2011) (governing restitution for offenses committed on or after November 1, 1997, and providing that the prior version of the Guideline shall govern all other cases); id., § 8B1.1(f)(1) (same for restitution obligations of organizational defendants). Of course, the Commission did not interpret the Fair Sentencing Act’s directive in this manner. But the possibility that it could (not to mention the probability that it should) have done so illustrates the folly of basing inferences about what Congress intended when it passed the Fair Sentencing Act on decisions the Commission would not make until several months later.[1]
Moreover, even if one takes it as given that the Commission’s new crack cocaine Guidelines would apply the lower 18-to-l ratio to all defendants sentenced after the new Guidelines were put in place, it would not follow that Congress necessarily expected the new mandatory mínimums to apply to preenactment offenders. The directive to update the Guidelines on an emergency basis is equally consistent with Congress’s seeking to avoid a mismatch between the Guidelines and the statutory penalties for postenactment offenders sentenced shortly after the Act’s effective date.
Petitioners and the Government discount this explanation, noting that because of the lags associated with investigating and prosecuting drug offenses, most of the defendants sentenced on the 91st day after the Fair Sentencing Act’s enactment were sure to be pre-Act offenders. If Congress did not expect the new mandatory mínimums to apply to such offenders, they say, there would have been no need to ensure *293 that revised Guidelines were in place so quickly. But most is not all, and it would have been entirely sensible for Congress to worry that some post-Act offenders—offenders clearly subject to the new mandatory mínimums—would nonetheless be sentenced under outdated Guidelines if the Guidelines were not revised in short order.
The 11-month median time between indictment and sentencing for non-marijuana federal drug offenses, see Administrative Office of United States Courts, Judicial Business of the United States Courts, p. 272 (2010) (Table D-10), does not establish that prompt issuance of new Guidelines for post-Act offenders could not have been a pressing concern. Because that is a median figure, it shows that half of all drug defendants are sentenced sooner than 11 months after being indicted. And it is only an aggregate figure. For drug possession offenses—relevant here because the Fair Sentencing Act eliminated the mandatory minimum sentence previously applicable to simple possession of crack cocaine, see § 3, 124 Stat. 2372—the equivalent figure was just 5.4 months from indictment to sentencing. The pace of criminal eases also varies considerably from district to district. In the Eastern District of Virginia, for instance, the median time from indictment to sentencing for all criminal cases was just 3.6 months. See Judicial Business, supra, at 252 (Table D-6). What is more, without the Fair Sentencing Act’s emergency directive, amendments to the Guidelines to implement the Act likely would not have been put in place until more than a year after its passage.[2] In the interim, a great many post- *294 Act offenders might have been sentenced under the outdated Guidelines, even though they were clearly entitled to take advantage of the statutory amendments. Because the emergency authority conferred on the Commission can reasonably be understood as directed at this mismatch problem, it creates no clear implication that Congress expected the new statutory penalties to apply to preenactment offenders.
The Court’s last argument is that continuing to apply the prior mandatory mínimums to preenactment offenders would lead to anomalous, disproportionate sentencing results. It is true enough, as the Court notes, ante, at 278-279, that applying the prior mandatory mínimums in tandem with the new Guidelines provisions—which track the new, more lenient mandatory mínimums—leads to a series of “cliffs” at the mandatory minimum thresholds. But this does not establish that Congress clearly meant the new mandatory mín-imums to apply to preenactment offenders. As noted above, supra, at 291-293, there is no reason to take the Guidelines amendments ultimately promulgated by the Commission as a given when evaluating what Congress would have understood when the Fair Sentencing Act was enacted. The Commission could have promulgated amendments that ameliorated this problem by retaining the old Guidelines ranges for preenaetment offenders.
Moreover, although the cliffs produced by the mismatch between Guidelines and statutory penalties are admittedly inconsistent with the premise of the Guidelines system that sentences should vary in proportion to the gravity of the offense and the culpability of the offender, see 18 U. S. C. *295 § 3553(a)(1), (a)(2)(A), the same objection can be lodged against any mandatory minimum that trumps an otherwise applicable Guidelines range. And it is not as though the results of continuing to apply the pre-Act statutory penalties are so senseless as to establish that Congress must not have intended them. Retaining the old mandatory mínimums ensures at least rough equivalence in sentences for defendants who committed their crimes at the same time, but were sentenced at different times—even as it leads to disparities for defendants who are sentenced at the same time, but committed their offenses at different times. In light of this plausible basis for continuing to apply the prior law to preen-actment offenders, there is no reason to conclude that Congress necessarily expected the new statutory penalties to apply.
B
Petitioners and the Government press a handful of additional arguments which require only brief discussion. They first contend that an intention to apply the new mandatory mínimums to preenactment offenders can be inferred from § 10 of the Fair Sentencing Act, 124 Stat. 2375, which instructs the Commission to study the effects of the new law and make a report to Congress within five years. The suggestion is that, if the statutory penalties do not apply to pre-enactment offenders, then the Act would have no effect on many defendants sentenced during the study period, which would in turn undermine Congress’s goal of compiling useful data. This is makeweight. Whether or not the new mandatory mínimums are held applicable to preenactment offenders, they will be applied to many postenactment offenders during the study period, and the Commission will have the opportunity to collect useful data. The study provision simply has nothing to say about the question at issue here.
The Government also notes that the Senate bill that ultimately became the Fair Sentencing Act was based on an ear *296 lier bill which contained a provision that would have delayed the Act’s effective date until 180 days after passage, and specifically provided that “[t]here shall be no retroactive application of any portion of this Act.” H. R. 265, 111th Cong., 1st Sess., § 11 (2009). Even if one is inclined to base inferences about statutory meaning on unenacted versions of the relevant bill, but see Hamdan v. Rumsfeld, 548 U. S. 557, 668 (2006) (Scalia, J., dissenting), this argument from drafting history is unpersuasive. That Congress considered and rejected a proposal that would have delayed application of the Act until 180 days after passage says nothing about whether the version finally enacted applies to defendants whose criminal conduct pre-dated the Act. Moreover, the same bill would have provided permissive authority for the Commission to promulgate amended Guidelines on an emergency basis, see §8(a), notwithstanding its delayed effective date provision. This point undercuts the argument that emergency amendment authority and immediate application of the new statutory penalties go hand in hand.
Petitioners finally appeal to the rule of lenity and the canon of constitutional avoidance. But the rule of lenity has no application here, because the background principle supplied by § 109 serves to remove the ambiguity that is a necessary precondition to invocation of the rule. See Deal v. United States, 508 U. S. 129, 135 (1993). The canon of constitutional avoidance also has no application here. Although many observers viewed the 100-to-1 crack-to-powder ratio under the prior law as having a racially disparate impact, see, e. g., United States Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy 8 (Apr. 1997), only intentional discrimination may violate the equal protection component of the Fifth Amendment’s Due Process Clause. See Arlington Heights v. Metropolitan Housing Development Corp., 429 U. S. 252, 264-265 (1977); Adarand Constructors, Inc. v. Peña, 515 U. S. 200, 217 (1995). There is thus no constitutional doubt triggered *297 by application of the prior mandatory minimums, much less the sort of “serious constitutional doub[t]” required to invoke the avoidance canon. Clark v. Martinez, 543 U. S. 371, 381 (2005).
[[Image here]]
In the end, the mischief of the Court’s opinion is not the result in these particular cases, but rather the unpredictability it injects into the law for the future. The Court’s decision is based on “[s]ix considerations, taken together,” ante, at 273, and we are not told whether any one of these considerations might have justified the Court’s result in isolation, or even the relative importance of the various considerations. One of them (the Commission’s emergency authority to issue conforming amendments to the Guidelines) is a particular feature of the statute at issue in these cases, but another (the fact that applying the prior statutory penalties alongside the new Guidelines leads to a mismatch) is a general feature of a sentencing scheme that calibrates Guidelines ranges to the statutory mandatory minimums for a given offense. Are we to conclude that, after the Sentencing Reform Act, § 109 has no further application to criminal penalties, at least when statutory amendments lead to modification of the Guidelines? Portions of the Court’s opinion could be understood to suggest that result, but the Court leaves us in suspense.
That is most unfortunate, because the whole point of § 109, as well as other provisions of the Dictionary Act, see 1 U. S. C. §§ 1-8, and the definitional provisions of the federal criminal law, see 18 U. S. C. §§ 5-27 (2006 ed. and Supp. IV), is to provide a stable set of background principles that will promote effective communication between Congress and the courts. In this context, stability is ensured by a healthy respect for our presumption against implied repeals, which demands a clear showing before we conclude that Congress has deviated from one of these background interpretive principles. Because the Court’s result cannot be reconciled with this approach, I respectfully dissent.

 Congressional reliance on future Commission action might be plausible if the Commission had a settled practice of tying reductions in statutory mandatory mínimums to immediately applicable reductions in Guidelines ranges, without any distinction based on the timing of the defendant’s offense. But the Court does not cite any such settled practice, and I am not aware of any. Presumably there has been no peeasion for a practice to develop either way, since congressional legislation reducing criminal penalties is, in this day and age, very rare.

 In the ordinary course, the Commission may submit proposed Guidelines amendments to Congress “at or after the beginning of a regular session of Congress, but not later than the first day of May.” 28 U. S. C. § 994(p). Unless disapproved by Congress, the proposed amendments “take effect on a date specified by the Commission, which shall be no earlier than 180 days after being so submitted and no later than the first day of November of the calendar year in which the amendment ... is submitted.” Ibid. As a matter of practice, the Commission has adopted November 1 as the default effective date for its proposed amendments. See United States Sentencing Commission, Rules of Practice and Proce *294 dure, Rule 4.1 (amended Aug. 2007). Because the Fair Sentencing Act was enacted on August 3, 2010—after May 1—there would have been no opportunity for the Commission to submit proposed amendments to Congress until January 2011. Given the 180-day waiting period, the amendments could not have gone into force until the véry end of June 2011 at the earliest. And in all likelihood, they would pot have been effective until November 1, 2011.